Our fourth argument of the day comes in Appeal No. 24-2298, the United States v. Mitchell... I think it's Melega. Melega? Melega? Okay. Okay. Ms. Evans, it's nice to see you. I see Mr. Simpsons here. Okay. Good morning, Your Honors, and may it please the Court. Irene Evans for Mitchell Melega. We're here today because there were multiple errors that occurred at Mr. Melega's sentencing. He was sentenced to 75 months on multiple counts of fraud and money laundering. There were two non-harmless guidelines errors that occurred. The application of the sophisticated means enhancement and the role in the offense enhancement as a supervisor without applying the correct standards. In addition, there were errors of applying the 3553A factors and considering information that was unreliable as criminal history. Turning first to the guidelines errors, the first that we identified was the application of the sophisticated means enhancement, which is a two-point offense-level enhancement applying the incorrect standard under the guidelines. In 2015, the guidelines were amended such that this specific enhancement requires an inquiry into the defendant's own individual conduct, rather than looking to the scheme as a whole and conspirator liability. However, the government at sentencing failed to identify any conduct of Mr. Melega's specifically that was sophisticated. Did the district court get it wrong? The district court did get it wrong, Your Honor. In what way? The district court accepted the government's arguments on sophisticated means, which articulated the incorrect standard. No alternative standard was ever articulated by. If we accept the standard as you have outlined for us here, that the knowledge has to be to the individual. Did the judge separate out any facts that applied only to Mr. Melega? So it's not the knowledge that has to be applied to the individual. It's the sophisticated means themselves, the actual activity. That's what I mean, the conduct, the knowledge. What did he do to engage in or to be found to be sophisticated means? The court did not articulate, the district court did not articulate any conduct of Mr. Melega's that was sophisticated, instead resting the application of the guideline enhancement on the fact that he had knowledge of the sophisticated elements of the scheme and the elements that the government pointed to as sophisticated was the creation of falsified documents, which they admitted at sentencing they did not know who created those documents and they had no evidence to indicate that it was Mr. Melega who created them. Did he not talk about, did the judge not talk about the emails? The judge talked about the emails, I believe, in the context of the supervisory role enhancement, not the sophisticated means. And we take the transcript as a whole, but going back to, did he articulate that Melega had a portion or played a role in creating the email? So the PSR, looking to the record as a whole, the probation sentencing. Sentencing transcript as a whole. The sentencing transcript as a whole. The emails that were discussed there were two emails sent to Mr. Young and Ms. Thompson. Those were relaying information regarding the various frauds that occurred. Whether those were themselves sophisticated, that was not relied on by the district court and it is not clear under the standard articulated by the guidelines that the sending of those emails is itself sophisticated means. He's telling them in the email that, how to avoid the bank, discovering what's going on. I don't know that I agree with that reading that it's clearly about avoiding discovery. Whether those could be sophisticated means, I think that's a question of fact that needs to be resolved by the district court and was not. Turning now to the supervisory role enhancement, this is another two-point guidelines enhancement that was applied, seemingly based on these two emails that were sent, one to Mr. Young and one to Ms. Thompson. However, there were several issues here. First of all, the district court did not resolve some factual disputes regarding authorship of the emails, which clouds the record somewhat on what exact basis we're looking at. The district court says that it's clear that Mr. Malega supervised somebody. However, his role within the company of I-80 was undisputedly supervisory and no distinction was drawn between supervision within the company and supervision within the criminal scheme that was going on. Furthermore... Why can't you look at his position? It's the way the government argued it. Unfortunately, the district court didn't make express findings. It more adopted the government's position, but at least in looking at that, if you consider the defendant's position, and we know that more than two people worked at I-80 and the rental company. It's not just him and Mr. Jones. There's other people that worked there. We know that the defendant has full awareness of the fraudulent scheme going on, and he's in a position where he is communicating with the banks. He's transmitting loan draw requests to the banks. He's then receiving proceeds, and it just comes with his position that way. Why isn't that, even if you don't get caught up, set aside supervision, why isn't he playing the role of leading or managing the fraudulent activity? Under the guidelines, supervision requires supervision of a participant, and participant is defined as someone criminally responsible in the scheme. No one else besides Mr. Malega and Mr. Jones were ever identified by name or otherwise as criminally responsible. Doesn't the guideline note organizer, leader, manager, or supervisor? Correct. Okay, what if you say he was managing it? Forget supervision, in other words. So managing the scheme as... Yeah, managing or leading it. So that's what I thought made your position difficult, was the fact that he is the corporate controller, and so he's at the epicenter of the financial activity, and he's at the epicenter of that well aware that there's a fraudulent scheme underway. I understand your point. I think the issue here, again turning to what the district court did say on this enhancement, is that it's clear he supervised somebody, meaning a person, so it appears the court was looking to control of another participant. However, that participant was never identified, whether it was likely Young or Thompson, but we don't know. Yeah, Kim Thompson? It could have been Kim Thompson. It could have been Kim Thompson, yeah. We don't know who it was. There was never a finding that that person was criminally responsible, which it's a blurred record and makes it difficult to know whether the facts that were being relied on meet the test this court has adopted for this standard, which requires more than a one-off directive, but an ongoing relationship of legitimate business. We have an acceptance of almost a $5 million bank fraud scheme that continued for over a year, and so if we're going to just looking at the sentencing transcript, not parsing out individual lines, if we look at the financial aspect of this criminal scheme. The position is that the record doesn't indicate that specifically, or that was not the basis of the application of this guideline, so whether it could have been applied on those grounds, that was not how it was applied in this case. And I'm into my rebuttal time here. Can we affirm on any basis supported by the record? Under some case law, this court has done so with regards to the supervisory role. That's United States v. SHU. Once the district court's reason for applying the guideline is found to be insufficient, the court then can look to the record as a whole, applying the seven factors that are included in the commentary notes to see if the person matches the definition there. Thank you. Ms. Evans, we're going to give you your rebuttal time. I've got one other question for you, so don't worry about the rebuttal. You'll get it. Okay. There's a third argument that you acknowledged at the outset of your remarks, and that is the unwarranted sentencing disparity. Yes, Your Honor. One of the things that stood out here to me that I'd like for you to comment on was the district court was clearly of the view that while your client pled guilty and accepted responsibility that way, he seemed to be kind of pulling back on that in various positions that he was taking. And one thing that struck me was he submitted a sentencing letter in advance of sentencing where he said he was ignorant and passive to the things going on around him. He probably didn't serve himself very well by submitting that position to the district court. Can you comment on that? I can. So both Mr. Mulligan and Mr. Jones were given two points of reduction on their offense level for acceptance of responsibility. So to the extent that it's already included in the guidelines calculation, we do have that. Beyond that, that letter reflected Mr. Mulligan's sort of emotional reaction to what had been going on with his life and the impact that it had had on his family. However, he did plead guilty. That requires acknowledging all the facts necessary to meet the elements of the crimes. Furthermore, Mr. Jones in his sentencing also essentially disclaimed an element by saying that not everything was done deliberately. So they're kind of in similar positions there. The acceptance of responsibility question is what the court relied on to differentiate these two defendants, but it doesn't really hold up to significant scrutiny when you consider that they both got the two points of acceptance of responsibility, and on neither case did the government move for the third point or object to that application. Pulling on the thread a little bit, what was Mr. Mulligan's position regarding his role looking at that letter? His position regarding his role was that he was aware of what was going on and was acting in Mr. Jones' direction for the most part. Okay. We'll give you that rebuttal time and let's hear from Mr. Simpson. Good morning. Good morning, Your Honor. Please the court. Scott Simpson on behalf of the United States. First of all, on the guidelines enhancements here, as you observed, Judge Scudder, Mr. Mulligan was the epicenter of this scheme. He was the company's financial controller, basically the chief financial officer. He actually became the financial controller for I-80 equipment in July 2016, and this bank fraud scheme started the following month in August 2016. He's the person, Mr. Mulligan as the financial controller, is the person, he's shuffling the paper. He's submitting the invoices, the false invoices to the banks. It's his job to keep track of things. Obviously, financial controller, he's controlling things. He had to make sure that the alterations in the invoices were believable and hard to detect. He had to make sure it was Mr. Mulligan's job to make sure that they were not actually buying the vehicles that were covered by the false invoices. They were obviously buying some, truly buying some vehicles and not buying others, and it was Mr. Mulligan who had to keep all of that straight. He had to make sure that the improvements that they were putting, the false improvements they were putting that they were asking for money to cover were believable, but again, that those fake improvements were not actually improvements that they were going to make. He was the one who had to keep track of all of this. Obviously, Mulligan and his co-defendant took deliberate steps to make the offenses difficult to detect, which is the core of the sophisticated means enhancement. And counsel, for sophisticated means, but I think this would apply to manager as well, would you agree that the district court had, it certainly had a lot of facts in front of it, certainly made some findings about whether, essentially saying that the scheme couldn't have occurred without either of the defendants, that they were kind of equal in that regard. But some of the findings that we'd have to make for this, these enhancements, aren't crystal clear. We're going to be looking at facts in the record that weren't explicit findings. Would you agree with that? Your Honor, as the court has observed already, he was relying on the PSR. The court expressly adopted the PSR, and he was relying, of course, on all the argument that the attorneys made at sentencing. On the sophisticated means, what the court said was, and again, after listening to all of this argument, after taking into account the pre-sentence report, the court said, in accepting the sophisticated means enhancement, said, well, I think, though, this still fits the knowledge and part of the redirecting and hiding of assets, again, referring to the fact that it was Mr. Malega who was redirecting all of this, who was helping to hide the assets, knowing they were fraudulent. He's not relying just on the knowledge, but also on the participation. Redirecting and hiding of assets, he continued, would qualify this as well for the sophisticated means. What page are you looking at? I'm looking at page 17 of the... Of the transcript? Of the sentencing transcript, yes. So it's... He doesn't go through it in great detail, but again, he's relying on the PSR and referring to the party's arguments. And it was Mr. Malega himself who was intimately involved in the sophisticated means. He was submitting the fraudulent invoices. He knew that they showed altered purchase prices, that they identified vehicles that the company did not intend to buy. And it was, again, Mr. Malega who had to keep track of all of this. He was... So the redirecting, hiding of assets... I'm sorry? On 17, when he's talking about the redirecting or hiding of assets, knowing that they were fraudulent, that qualifies under the sophisticated means. He's talking about Malega's conduct. He's talking about Malega's conduct and saying that, yes, Malega qualifies for the sophisticated means. Yes. So on the role enhancement, just as it's typical for any chief financial officer or especially a financial controller of a small company not to be directly supervising a lot of employees, Mr. Malega did not supervise, directly supervise a bunch of employees. But he did have a key organizing role in this scheme. On at least one occasion, we've referred to the emails. He directed an employee at I-80 Equipment to get vehicle information, vehicle identification numbers to be included in fake invoices. And on at least one occasion, he directed an employee at JP Rentals, the other company. Was there a finding by the district court that he did redirect Jones's brother to that? I know counsel on the other side indicated maybe that behavior was not associated directly with Mr. Malega. And so I didn't know if there was a finding made at the sentencing of that. You're talking about the one... The VIN numbers directing... You're talking about the one email where the defense said, well, he didn't... The defense never... The defense said, true, Mr. Malega did not generate or author that email. It came from his email address. So obviously he sent it. And I believe even on appeal, in neither of the appellant briefs here, opening brief or reply brief, have they asserted that Mr. Malega did not send the email. I think that would be untrue. That's the one involving that guy, Young? It's the one from an IAD equipment telling him to get false invoices. Somebody named Young is on the other side. I believe that's Young, yes. The other one is Kim Thompson. Okay. There's one... While we're on the facts, the email to Kim Thompson, that's a different email. Correct. And that involves the rental scheme. The JP Rentals. Where they were going to bump up the renovations of some house from like 100 grand to one third. Exactly. Or 101 to 130. Okay. Does the PSR or the sentencing record ever show whether that appraisal was inflated and submitted? No, Your Honor. I don't believe it does. I don't believe it... I believe the PSR talks about the email, but I don't believe it talks about the ultimate outcome of that effort with that house. So again, he played a very... He played at least a coordinating and organizing role in this scheme. The guidelines, of course, allow for three different levels of role enhancement. Four levels, three levels, and two levels. And Mr. Malega got the lowest, and we believe that was easily warranted under this scheme. Mr. Malega also, I think we need to remember, had an accounting degree. He had an MBA. He had the professional knowledge, the professional skill that were necessary to carry out this scheme. In fact, he could have received, he probably could have received the special skill enhancement under 3B1.3 in lieu of the role enhancement. He was, again, the financial controller, controlling all of what was going on here with the paper flow with the banks. Turn briefly to the procedural errors with the rest of my time. First of all, the statement in the PSR about Mr. Malega's prior conduct with his prior employer. First of all, the defense never objected to that statement in the PSR below. This court has said that in that kind of situation where PSR sets it out, they make objections to other things in the PSR. The court has said this is in the Rogers decision quoted in our brief. That is the paragon of intentional relinquishment that warrants a finding of waiver. And that's what happened here in relation to that comment in the PSR about his conduct with his prior employment. In any event, that information did have sufficient indicia of reliability since the prior employer provided that information directly to the probation officer. And since Mr. Malega did not contest that information, the government then did not have an obligation to come forward with that evidence. And actually that would have put Mr. Malega in an even worse light. I didn't read the transcript. I mean, it's definitely mentioned. That's why everybody's talking about it. But it didn't seem to play that significant of a role. What seemed to really matter at the end of the day was he was almost kind of walking back. He didn't try to withdraw his plea, of course, but he was kind of walking back his acceptance of responsibility. He was a little bit, Your Honor. But the judge did refer to the fact that he said something like this is, I guess, apparently not Mr. Malega's first go-round. Yeah, it's mentioned. I'm paraphrasing. That's why they're arguing about it. And of course, again, that's probably why Mr. Malega did not contest the information because if the government had come in with evidence to support it, it would have made it look even worse. This was not referred to in the defense argument, but they had this argument in there about a line in the statement of reasons. First of all, we would contend that they cannot rely on that on appeal now since it's only in the reply brief. I see that my time has expired. I could address that some more if the Court has any questions on it or on any other issue. Not hearing any questions, Mr. Simpson, you have our thanks. I'm going to give Ms. Evans the two minutes of rebuttal that she asked for. Thank you, Your Honor. You're welcome. So, responding back to a question that you asked me, Judge Scudder, about whether supervision could be found based on his role within the scheme managing assets, I would point you to Commentary Note 2 to that enhancement, which states that to qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. So that refers to specifically supervising people. Next, we would just note that looking through the sentencing transcript, we can't find that the District Court ever adopted the PSR as its factual basis on anything, or in general, as the factual basis for the guidelines enhancements that it found. And finally, just noting that the government argues today that it was Mr. Malega's job to ensure that invoices were manipulated. However, this directly contradicts their position at sentencing. If you look at page 10 of the appendix, the attorney for the government says, quote, we don't know who altered the invoices. And I believe that another point says that they have no evidence that Mr. Malega was responsible for that. I'm happy to answer any other questions. Otherwise, we ask that Mr. Malega's sentence be vacated and the case remanded for resentencing. Okay. Very well. We appreciate it very much. Mr. Simpson, thanks again to you and the government. And Ms. Evans, we want to extend a special thanks to you. You accepted the appointment through your law school clinic. We very much appreciate that. Mr. Malega was very well represented. Professor Stevenson, we appreciate your clinic taking these cases on. Mr. Iverson, it's nice to see you here today as well. So with those thanks, we'll take the appeal under advisement.